# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SHELAH H., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19 C 4781 |
| v. ) | |
| ) | Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Shelah H.[3] alleges that she has had mental impairments, in particular anxiety/panic disorder with agoraphobia and depression, since her teens. She was first granted disability benefits

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On September 9, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E.9.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

in 1994 dating back to 1992; her benefits ceased in July 1998.[4] (R. 687.) In May 2010, Plaintiff again applied for benefits, alleging that her onset date for disability was July 1, 1998; her date last insured ("DLI") was June 30, 2003. (R. 151, 977.) After a hearing in 2012, an ALJ held that Plaintiff was not disabled and on appeal, the district court remanded her case for further consideration. (R. 14-27, 535-544). After a second hearing in 2015 and second determination by the same ALJ that Plaintiff was not disabled, Plaintiff again appealed, and another district court judge remanded her case for further consideration. (R. 400-415, 799-803). A different ALJ held a third hearing in 2019, holding on May 10, 2019, that Plaintiff was not disabled.[5] Plaintiff seeks remand of the Commissioner's decision denying her application for benefits (D.E. 14), and the Commissioner has asked the Court to affirm the decision. (D.E. 21.) The matter is now fully briefed.

## I.     BACKGROUND

This is the third time Plaintiff's case has come before a district court for consideration after an ALJ found that she was not disabled. Given that the time period for which Plaintiff must prove disability has not changed – July 1, 1998 to June 30, 2003 – we will restate the medical evidence only as necessary for our decision.

---

[4] The records from Plaintiff's receipt and then loss of disability benefits are unavailable because they were destroyed pursuant to SSA protocol after a certain period of time elapsed. (R. 537, 717.) Plaintiff testified that her benefits were terminated because she failed to return a letter from the social security administration which was presumably part of the SSA's regular review of disability recipients' continued eligibility to receive benefits. (R. 421.) There is no evidence, and the Commission does not contend, that Plaintiff's benefits were terminated because she was adjudicated to be no longer disabled.

[5] The record does not contain the Appeals Council denial of review of this ALJ decision; Plaintiff claims she filed a timely notice of appeal pursuant to 20 U.S.C. § 405(g) and the Commissioner does not deny this contention.

### A. Medical Record

Plaintiff was born on July 7, 1952. She was hospitalized twice for "schizo-affective disorder" as a teenager in 1968-69 (R. 359-386) and again in the late 1970s for a seizure and "some kind of psychotic break." (R. 271.) She worked as a corrections officer in a penitentiary from 1984 until 1992 but reported leaving the job because of depression and agoraphobia. (R. 37-38.) The record contains no medical or other evidence from Plaintiff's alleged onset date until her DLI. She began treating with general practitioner Michael Santilli, M.D., on September 11, 2003, about three months after her DLI. (R. 240.) Her intake form for his practice indicated that she was taking Celexa but does not reflect any past diagnoses or treatment of mental health issues. Between 2003 and 2012, Plaintiff visited Dr. Santilli for treatment of various physical impairments including thyroid disease, high blood pressure, asthma, acute leg pain, and a persistent cough. (R. 228-267.) Treatment notes from Dr. Santilli in 2004, 2005, and 2006 indicated that Plaintiff was "oriented x3" and had appropriate mood/affect and insight. (R. 232, 234, 242.)[6] In 2007, Dr. Santilli diagnosed Plaintiff with depression and noted again that she was taking Celexa and had taken it in the past "with good result." (R. 228-230.)

### B. Medical Opinions Prior to 2019 Hearing

In 2010, psychiatrist Mark Amdur, M.D., evaluated Plaintiff at the request of her attorney. After a 75-minute examination, he diagnosed Plaintiff with panic disorder with agoraphobia and as having psychiatric "signs and symptoms" that included agoraphobia, social avoidance, distorted body image, obsessions, hoarding, compulsions, depression, and self-loathing. (R. 272.) He opined that Plaintiff would not be able to reliably travel to a workplace and that her phobias and panic

---

[6]These assessments were made by circling the appropriate response on a standard form that Dr. Santilli completed during each of Plaintiff's medical appointments as a part of his review of all of her physical and mental systems.

disorder would interfere with her ability to relate to co-workers and tolerate work-related stress. (R. 272-273.)

At Plaintiff's first hearing in 2012, Alexander Eschbach, M.D., testified as an impartial medical expert that the medical record contained scant evidence of psychiatric and psychological issues during the relevant time period but that based on his observations and review of the medical evidence, he agreed that Plaintiff had a personality-type disorder. (R. 44.) Specifically, Dr. Eschbach testified that certain records from 1968-1970, which discuss a long history of a "characterological disorder" as well as Plaintiff's testimony, supported diagnosis of an Axis II personality disorder[7] with social components including agoraphobia, but an Axis I serious psychiatric disorder was not necessarily indicated based on the record. (R. 44-45, 359-376.)

At the 2015 hearing, Dr. Amdur testified to evaluating the Plaintiff in 2010, which was the only time he saw her. (R. 446.) Based on that examination, he diagnosed her with panic disorder and agoraphobia and opined that if required to interact with the public either socially or in a work environment she was likely to experience severe panic attacks that made her markedly limited in her ability to perform activities of daily living, maintain social functioning, and maintain concentration, persistence, and pace. Her social avoidance and germ phobia were the "driving force" for her social withdrawal. (R. 447-49.)

---

[7] Prior to 2013, "the DSM-IV approached psychiatric assessment and organization of biopsychosocial information using a multi-axial formulation. There were five different axes. Axis I consisted of mental health and substance use disorders (SUDs); Axis II was reserved for personality disorders and mental retardation; Axis III was used for coding general medical conditions; Axis IV was to note psychosocial and environmental problems (e.g., housing, employment); and Axis V was an assessment of overall functioning known as the GAF. The GAF scale was dropped from the DSM-5 because of its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in the descriptors) and questionable psychometric properties." In 2013, the DSM eliminated the categorization of mental health impairments by Axis number. https://www.ncbi.nlm.nih.gov/books/NBK519711/.

Also at the 2015 hearing, Ellen Rozenfeld, M.D., testified as an impartial medical expert and noted that medical records available from 1968 and 1969 included diagnoses of "adjustment reaction to adolescence" and a probable schizoaffective disorder. (R. 460.) She also considered Dr. Santilli's records and opined that aside from the diagnosis of depression there was no evidence of other mental health issues during the relevant time period; specifically, there was insufficient evidence in the record of anxiety or agoraphobic behavior as described by Dr. Amdur. (R. 461.) Dr. Rozenfeld specifically noted that nothing in Dr. Santilli's records suggested that Plaintiff's physical impairments, including stomach pain and shortness of breath, were related to any sort of mental health problem or specifically related to Dr. Amdur's 2010 diagnosis of anxiety and agoraphobia. (R, 464-65.) Dr. Rozenfeld also found insufficient evidence to assess Plaintiff's level of limitation as measured by the "Paragraph B" criteria during the relevant time period and thus opined that the record did not support the presence of a medically determinable psychological impairment prior to the date last insured. (R. 461.)

### C.  Hearing Testimony

At Plaintiff's third hearing on April 16, 2019, this time before a new ALJ, she testified that she was unable to work during the claims period because she "could not stand" to go into work. (R. 749.) She said she hated the confinement, the lack of sanitation, "the walls closing in"; she said she quit her job in 1992 because she "couldn't take it anymore." (*Id.*)

Dr. Amdur also testified again, without having seen Plaintiff since his 2010 examination of her. At this hearing, he testified based not only on his 2010 examination but also having had reviewed the medical evidence (records from Plaintiff's adolescent psychiatric treatment, his own examination notes, and Dr. Santilli's treatment notes) and again opined that his best diagnosis for Plaintiff was panic disorder with agoraphobia. (R. 760.) Dr. Amdur also testified that by looking

5

at Plaintiff's treatment record as a whole, he opined that her teenaged mental health issues were a pre-cursor to her adult agoraphobia and that in 1992 it was likely Plaintiff was symptomatic with depression, anxiety, and body dysmorphia, stating that if you "connect the dots," Plaintiff was likely disabled throughout the entire relevant period, with her brief ability to work representing her temporary ability to overcome her symptoms, but that they gradually took over. (R. 763.) Dr. Amdur specifically pointed to Plaintiff's testimony about her inability to be around people and the physical manifestations of panic, as well as her history of "multiple cosmetic procedures as issues that contributed to her work-related impairments along with her agoraphobia and anxiety." (R. 761-62.) He ultimately opined that Plaintiff's ability to relate to coworkers, supervisors, and the public was extremely limited and that she would likely miss at least one day of work per week and that she would be extremely disrupted at work by panic symptoms, germ preoccupations, and perceived thoughts of others. (R. 760-63.)[8]

### D. ALJ Opinion

As in the two previous decisions, the ALJ here found Plaintiff had medically detectable impairments, in this case depression, personality disorder, asthma, hypertension and hypothyroidism, but that none of them was severe because none significantly limited her ability to perform basic work-related activities for 12 consecutive months. (R. 721).[9]  Therefore, the ALJ dismissed the case at Step Two of the five-step analysis. 20 CFR 404.1520(a).  In doing so, the ALJ agreed that Plaintiff's impairments could cause the various symptoms about which she

---

[8] The record also contains an Agency opinion from November 8, 2010 that found insufficient evidence on which to make a determination of disability, based on the records from the claims period. (R. 277-89.)

[9] The ALJ gave examples of basic work activities as described by the regulations, including (1) physical functions such as walking and carrying; (2) capacities for seeing, hearing and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. (SSR-85-28.)

testified, but the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible with the medical evidence." (R. 722.)

Specifically, the ALJ declined to accept Plaintiff's testimony that her depression and personality disorder were as severe as she alleged because the allegations were inconsistent with the available medical evidence, in particular evidence from during and most proximate to the claims period. (R. 723.) The ALJ described Plaintiff's testimony at each of her three hearings, noting that in 2012 and 2015 she testified about living alone with several dozen animals and that she shopped infrequently and only late at night at convenience stores where she was unlikely to run into other people (R. 724.) The ALJ also acknowledged Plaintiff's testimony that she had stopped working in 1992 due to increasing depression and that leaving her home caused her to experience stomach cramps, difficulty breathing and diarrhea, and that by 1998 she would have experienced these symptoms if she had to face the prospect of going to work. (*Id.*) At the 2012 and 2015 hearings, the ALJ noted, Plaintiff testified that that she supported herself with a trust fund but did not have health insurance and could not afford mental health treatment, although she had seen a psychiatrist in the 1990s who prescribed medication for depression.

As for the most recent hearing, the ALJ discussed Plaintiff's continued testimony about her solitary lifestyle, that she had moved to a farm in the early 2000s because the city was too crowded, and that she still shopped at night and in bulk so that she could avoid the symptoms she experienced from being around others including feeling nervous, sweaty, and needing to use the bathroom. (*Id.*)

The ALJ next discussed the testimony of the medical experts who spoke at each hearing, noting that each of them explained that there were no records from the relevant time period. (R.

725-26). She acknowledged Dr. Eschbach's testimony that Plaintiff likely had an Axis II (but not more severe Axis I) personality disorder, and noted that Dr. Rozenfeld testified that "while Plaintiff's testimony about her functioning suggested a social-phobic response and avoidance, it was not referenced in the record during the time period at issue," and that the records most proximate to the claims period did not support agoraphobic behavior or psychologic response as described by Dr. Amdur in his 2010 report and 2015 testimony. (*Id.*) Ultimately, the ALJ gave Dr. Eschbach's opinion -- that without treatment Plaintiff would have had issues going to work on a daily basis and marked difficulties with social functioning -- little weight because Dr. Eschbach never examined the Plaintiff, his familiarity with her mental functioning was based on the record available at the time, it was speculative, and was not consistent with the largely unremarkable findings made by Dr. Santilli. (R. 732-33.)

The ALJ also gave little weight to Dr. Rozenfeld's opinion that there was insufficient evidence in the record to evaluate the Paragraph B criteria or to establish the presence of a medically determinable impairment prior to the DLI because she did not conduct an in-person examination of Plaintiff, and her opinion was not consistent with the objective medical evidence, which, although scant, did support the presence of depressive and personality disorders. (R. 734.)

The ALJ spent more time discussing Dr. Amdur's opinion and his testimony from the 2019 hearing, particularly his conclusion that Plaintiff's psychological impairments from her youth continued unabated through the claims period and then past it. She acknowledged that Dr. Amdur was the only opining doctor to have examined Plaintiff and noted his long experience as a psychiatric consultant for Disability Determination Services, but ultimately determined that Dr. Amdur's opinion was entitled to little weight because it was not supported by the medical records from Dr. Santilli, which were the ones most proximate to Plaintiff's DLI. (R. 726.) Specifically,

8

the ALJ noted that none of Dr. Santilli's examination records connected Plaintiff's various physical impairments to her mental health issues or otherwise suggested a physical manifestation of those issues. (R. 728-29.) The ALJ commented on the lack of evidence in Dr. Santilli's notes that Plaintiff experienced the symptoms about which Dr. Amdur had testified, including body dysmorphia, self-loathing about her appearance, or concern about germs or the cleanliness of the medical office. (*Id.*) In so finding, the ALJ considered and compared Dr. Santilli's treatment notes from 2010 and 2011 to Dr. Amdur's notes of his own 2010 examination of Plaintiff, finding that nothing in Dr. Santilli's notes suggested that Plaintiff was experiencing any mental health impairments or physical manifestation of such impairments at the time. For this reason, the ALJ afforded Dr. Amdur's 2010 opinion little weight.

With respect to Plaintiff's argument (and pursuant to the Appeals Council directive) that the lack of treatment records was evidence supporting her social phobia, the ALJ found no evidence that Plaintiff made "elaborate preparations" to see Dr. Santilli as she testified doing prior to her 2010 examination by Dr. Amdur or that Dr. Santilli's notes indicated that Plaintiff's care or treatment was at all lacking because of her failure to appear for appointments. (R. 729.) Instead, the ALJ concluded that Plaintiff simply did not need further care during this time period. In so finding, the ALJ acknowledged that Plaintiff's medical records from 1968 and 1969 reflected that her mental health improved with treatment, and also that Plaintiff did not have health insurance during the claims period, which the ALJ accepted as contributing to Plaintiff's lack of treatment. Overall, however, the ALJ found that nothing in Dr. Santilli's records supported Plaintiff's testimony that her symptoms consistently manifested when she had to go out or thought about going out and noted that this determination was supported by Dr. Rozenfeld's testimony that Plaintiff's alleged symptoms were not evidenced in Dr. Santilli's notes. (R. 730.)

9

Next, in recognition that Plaintiff had medically determinable mental impairments, the ALJ considered all of the Paragraph B criteria of mental functioning. She determined that Plaintiff had no limitations in any of the four areas of understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; or adapting or managing herself. (R. 731-32.) As relevant to our decision, the ALJ found that Plaintiff had no limitations in interacting with others after considering the records from Dr. Santilli reflecting a normal mood and affect and that Plaintiff was able to attend her medical appointments. (R. 731.) The ALJ discounted Plaintiff's testimony about her isolated life and increasing inability to interact with others, finding it not supportive of her allegations of social phobia because it was inconsistent with her ability to shop in stores (albeit late at night), and take public transportation to her appointment with Dr. Amdur. (*Id.*)

In sum, the ALJ determined that Plaintiff's mental impairments caused no more than mild limitations in any of the functional areas and thus were non-severe, and that all of her physical and mental impairments either singly or in combination did not significantly limit her ability to perform basic work activities and were therefore non-severe. (R. 732.)

## II. LEGAL STANDARD

The ALJ's theory in finding Plaintiff does not have a severe impairment at Step Two of the sequential process centers primarily upon a lack of evidence during the relevant period or in the time period most proximate to Plaintiff's DLI. To obtain benefits, Plaintiff must establish that she became disabled before her DLI of June 30, 1998, *Kaplarevic v. Saul*, 3 F.4th 940, 942 (7th Cir. 2021), meaning "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of no less than twelve months." 42 U.S.C. §§ 423(d)(1)(A).

10

An ALJ's decision will be affirmed if it was supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. In making this determination, "[w]e will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal quotations omitted). The ALJ here (as with the previous two decisions), found that Plaintiff did not have a severe impairment at Step Two of the sequential analysis. Therefore, she did not address the remaining analytical steps, including whether Plaintiff's impairments met a Listing, whether she was able to perform her past work, or, if she was not able to perform her past work, whether her residual functional capacity allowed her to work at other jobs that existed in significant numbers in the economy.

**III. ANALYSIS**

In both previous decisions in this case, the magistrate judges remanded because the ALJ failed to support with substantial evidence her decision to give little weight to Dr. Amdur's 2010 opinion on the ground that it was too attenuated from Plaintiff's alleged period of disability and because there were no mental health records at all from the claims period.[10] Both Judge Daniel Martin and Judge Susan Cox questioned how the ALJ could give "little" weight to Dr. Amdur while at the same time crediting the opinions of Dr. Eschbach and Dr. Rozenfeld, who also had no mental health records to review from the relevant time period and who both observed the Plaintiff

---

[10] *See* Plaintiff's Mem. in Support of Summ. J., exh. 1, 2

11

at dates even farther away from her date last insured. Indeed, Judge Cox also noted that the ALJ herself – someone with presumably no medical or psychiatric training – was tasked with the same job of determining whether post-insured evidence applied during the disability period. (R. 801-02.)

On remanding the case again, this time to a new ALJ, the Appeals Council instructed the ALJ to:

- Give further consideration to the opinion of Mark Amdur, M.D., that includes consideration of factors including his specialty as a psychiatrist and the consistency of his opinion with the record as a whole;

- Assess the weight to be given to the opinion of Dr. Amdur and the opinion of the prior medical expert and further articulate any reasons for differences given to the weight of those opinions;

- Consider the reasons that the claimant might not have pursued regular medical treatment, thereby creating the dearth of records during the relevant time period, including the claimant's lack of health insurance and "the fact that [her] personality disorder may have contributed to her failure to seek care." (R. 718.)

For her part, Plaintiff argues for remand on the grounds that the ALJ erred by (1) rejecting Dr. Amdur's opinion; (2) making a faulty evaluation of Plaintiff's impairments; and (3) making an erroneous evaluation of the consistency of Plaintiff's reported symptoms. After considering the parties' arguments and the evidence, while we appreciate the time the ALJ took to attempt to address the issues raised by the Appeals Council, we must remand once again because substantial evidence does not support the ALJ's Step Two determination that Plaintiff did not have a severe impairment.

Generally, "the step two determination of severity is 'merely a threshold requirement.'" *Castile v. Astrue,* 617 F.3d 923, 926–27 (7th Cir. 2010) (citation omitted; quoting *Hickman v. Apfel,* 187 F.3d 683, 688 (7th Cir. 1999)). *See also Bowen v. Yuckert,* 482 U.S. 137, 149–50 (1987) (disability insurance benefit payments require a "threshold showing of medical severity.) That is,

12

"[a]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process...." *Id.*

In this case, however, the ALJ ended her analysis at Step Two after finding that Plaintiff had no severe impairments. Therefore, we must consider more carefully the ALJ's Step Two determination that none of Plaintiff's impairments caused more than a minimal effect on her ability to perform basic work activities. And when we take a closer look, we find a number of inconsistencies in the ALJ's determination that Plaintiff's depression and personality disorder were not severe.

SSR 96-3p provides the basis for our decision. "The rule requires a careful evaluation of symptoms when making '[a] determination that an individual's impairment(s) is *not severe.*'" *Curvin v. Colvin*, 778 F.3d 645, 648–50 (7th Cir. 2015), *citing* SSR 96-3p (emphasis in original). *"*In other words, if an individual's impairment does not appear from the objective medical evidence to be severe, the ALJ must then consider the limitations and restrictions caused by the individual's symptoms. If these additional considerations cause "more than a minimal effect on an individual's ability to do basic work activities, the [ALJ] must find that the impairment(s) is severe *and proceed to the next step in the process* even if the objective medical evidence would not in itself establish that the impairment(s) is severe." *Id.* (emphasis in original.)[11]

---

[11] The Commission's commentary on the ruling further explains the ALJ's role in applying the "not severe" standard: "Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued. In such a circumstance, if the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience." https://www.ssa.gov/OP_Home/rulings/di/01/SSR85-28-di-01.html *visited on* March 30, 2022.

A.    **Evidence that Plaintiff Could Not Perform Her Past Work**

The regulations provide that in the evaluation of a claimant's impairment for severity at Step Two, an inability to perform past work generally suggests that a Step Two dismissal is not appropriate:

> If the medical evidence establishes only a slight abnormality(ies) which has no more than a minimal effect on a claimant's ability to do basic work activities, but evidence shows that the person cannot perform his or her past relevant work because of the unique features of that work, a denial at the "not severe" step of the sequential evaluation process is inappropriate. The inability to perform past relevant work in such instances warrants further evaluation of the individual's ability to do other work considering age, education and work experience.

https://www.ssa.gov/OP_Home/rulings/di/01/SSR85-28-di-01.html
*visited on* March 30, 2022.

In this case, Plaintiff was adjudicated disabled and granted benefits in 1992 after leaving her job as a prison corrections officer. Her benefits were apparently terminated on June 30, 1998, due to her failure to respond to a letter seeking to confirm the continuation of her disability, not because she was found to be no longer disabled. Regardless of whether Plaintiff might have been able to perform a different job during the claims period, the evidence establishes at the very least that she was considered disabled, and thus not able to work at all, let alone at her previous job as a corrections officer, up until the day before her alleged onset date of July 1, 1998. For this reason alone, the ALJ's determination that Plaintiff did not have a severe impairment is not supported by substantial evidence.

Moreover, as the Seventh Circuit has previous explained, "[t]he Step 2 determination is 'a *de minimis* screening for groundless claims.'" *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697, 2016 WL 4197915, at *6 (7th Cir. Aug. 9, 2016) (quoting *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016)). In *O'Connor-Spinner,* the Seventh Circuit rejected an ALJ's determination that a

14

claimant's major depression was not severe at Step Two, noting that the determination "strikes us as nonsensical given that the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from 'clinically significant distress or impairment in social, occupational or other important areas of functioning." 832 F.3d at 697. Even Dr. Santilli, on whose treatment notes the ALJ primarily relies, recognized that Plaintiff experienced depression severe enough to require medication and that, combined with the fact that Plaintiff had been previously granted disability benefits, belies any determination that Plaintiff's claim is groundless and thus deserving of dismissal at Step Two. *See also, Taylor v. Berryhill*, 387 F. Supp. 3d 883, 892 (N.D. Ill. 2019).

In *Taylor,* the ALJ's determination at Step Two that the claimant's depression was not severe despite no diagnosis to the contrary was harmless error because the ALJ proceeded with the remaining steps in the five-step analysis and took the claimant's mild "Paragraph B" limitations into account in crafting her RFC. In this case, the ALJ found Plaintiff's depression and personality disorder to be non-severe despite the fact that the record contained no conflicting diagnoses, but the ALJ's analysis ended there. The Court is thus unable to follow a "logical bridge" from the diagnoses of depression and personality disorder to the ALJ's determination that Plaintiff's mental health impairments were not severe.

### B. Dr. Eschbach and Personality Disorder Diagnosis

The ALJ's determination that Plaintiff did not have a severe impairment is also belied by her contradictory acceptance of Dr. Eschbach's opinion that Plaintiff had a personality disorder and simultaneous decision to give his entire opinion – which contained that analysis – little weight. This is nearly the same error made in the previous two decisions and it is not rectified here, despite the ALJ's decision to give Dr. Eschbach's opinion little weight. Although the ALJ here took more time than her predecessor to explain that she discounted the testifying doctor's opinion because it

15

was not supported by Dr. Santilli's treatment notes, her effort does not describe why she still accepted Dr. Eschbach's ultimate determination that Plaintiff has a personality disorder or how that diagnosis can be reconciled with a finding that Plaintiff's mental impairments were not severe. Dr. Eschbach's testimony about Plaintiff's likely personality disorder stated that Plaintiff would not be able to work without treatment. And while the ALJ was entitled to weigh and discount that testimony (and the Court cannot reweigh the evidence itself), she did not do so, instead accepting the diagnosis and finding Plaintiff had the impairment of personality disorder, which again leaves the Court without a logical bridge from the evidence to the ALJ's conclusion of non-severity.

In sum, given that the Step Two determination is designed primarily to weed out groundless claims, we do not find that the ALJ supported her decision to dismiss Plaintiff's claims at Step Two with substantial evidence. Had the ALJ continued on to Steps Three through Five, our conclusion might have been different, but that issue was not before the Court. This case is remanded with instructions for the ALJ to consider specifically whether Plaintiff has at least one severe impairment that satisfies Step Two's threshold requirement and if so, to continue to evaluate Plaintiff's claims at Steps Three through Five.

## CONCLUSION

For the foregoing reasons, we grant Plaintiff's request for remand (D.E. 14) and deny the Commissioner's motion to affirm (D.E. 21).

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: April 6, 2022**